[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12826

_____

D.C. Docket No. 3:11-cv-04355-CLS

WILLIAM M. RODDY,
WENDY SUE RODDY,

Plaintiffs-Appellants,

versus

CITY OF HUNTSVILLE, ALABAMA,
TERRY LUCAS,
JASON M. RAMSEY,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 29, 2014)

Before TJOFLAT and WILLIAM PRYOR, Circuit Judges, and SCOLA,* District
Judge

PER CURIAM:

_____

* Honorable Robert N. Scola, Jr., United States District Judge for the Southern District of
Florida, sitting by designation.

In this appeal we consider whether the arrests of Dr. William Roddy and his wife and the search of their hotel room, pursuant to a search warrant, violated their right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. The Roddys' day was off to a bad start when a hotel employee called 911 after Dr. Roddy allegedly pulled his gun on another hotel guest. It got worse when officers searched Dr. Roddy and recovered a gun, nearly $3,900 in wadded-up cash, and controlled substances. And then a search of Room 1020 offered a treasure trove of pain pills and other drugs. Because the officers acted with arguable probable cause when they arrested Dr. Roddy and his wife and because Officer Jason Ramsey procured a valid search warrant before searching the Roddys' hotel room, we conclude that the officers are entitled to qualified immunity. We affirm the summary judgment against the Roddys.

## I. BACKGROUND

Dr. William Roddy and his wife, Wendy Roddy, checked into the Embassy Suites hotel in March of 2010. They brought their three sons, Eric, Asher, and Cameron, and a friend of Cameron's to celebrate Cameron's twelfth birthday. After checking in, some of the boys ventured to the hotel pool.

That night, pharmacist Rowdy Meadows was also at the hotel with his family. He and some of his children went to the pool for the evening and observed one of the Roddy boys repeatedly dunking the other in the deep end. After the third

2

dunk, Meadows feared the younger Roddy boy was in danger and urged them to stop. The Roddy boys returned to their hotel room and reported to their parents that some man had yelled at them.

The next morning, Dr. Roddy decided to get to the bottom of the pool incident after Cameron's friend spotted Meadows at breakfast. According to Meadows, Dr. Roddy introduced himself as "Judge." But Dr. Roddy disputes that. Dr. Roddy pestered Meadows for details about what happened at the pool the previous night. When Meadows began walking away, Roddy said he reached into his front pocket for a business card to give to Meadows. Meadows caught a glimpse of Roddy's gun, which was also in his front pocket. Or, according to Meadows, Roddy demanded that Meadows keep talking to him and "pulled a gun out of his left pocket."

Meadows sped to the front desk of the hotel to report the incident. Meadows told the front desk clerk that Dr. Roddy had a gun. Meadows testified that Dr. Roddy approached the front desk and again introduced himself as "Judge," which Dr. Roddy disputes. Dr. Roddy protested that he had a permit and began to reenact how he accidentally pulled the butt of the gun from his pants pocket. The clerk called 911 and reported that a man had pulled a gun on a guest in the lobby of the hotel.

Before any officers arrived, Dr. Roddy returned to his hotel room to use the bathroom and to search for his gun permit. Thinking the permit was in the pocket of his lab coat, he donned the coat as he left his room. Dr. Roddy testified that he packed the coat for his son's birthday trip in a hurry because he was a "pack rat." The lab coat was embroidered with the name "Dr. William M. Roddy."

As Dr. Roddy left his room and approached the elevators to return to the lobby, a handful of police officers approached him. But neither Officer Ramsey nor Officer Terry Lucas were present during this encounter. The officers asked Dr. Roddy's name and searched him. The officers located the gun in his left front pocket and then emptied the other pockets of his pants and lab coat. They found an unlabeled, grey pill box containing an assortment of pills, a brown bottle of injectable testosterone, and $3,895 of crumpled bills in various denominations. The officers determined that of the 21 pills in the pill box, there were 6 Oxycontin pills, 7 Adderall pills, 2 Focalin pills, 1 Mirtazapine pill, 2 Lexapro pills, 2 Atenolol pills, and 3 unidentified pill fragments. Dr. Roddy said the pills were for personal use and told one of the officers that he had prescriptions in his hotel room. After the search, the officers read Dr. Roddy his Miranda rights and placed him at a table in a board room on the tenth floor of the hotel, where he sat for several hours.

Officers Ramsey and Lucas arrived on the scene after the initial search of Dr. Roddy. An officer called Ramsey to the scene around 10 a.m. and reported that

a man had pulled a gun on another guest. Ramsey later asked for Lucas's assistance with the search of the hotel room. At the time, both Ramsey and Lucas were officers of the City of Huntsville Police Force and assigned to the multi-jurisdictional Strategic Counter Drug team. Ramsey is now a Sergeant of the City of Huntsville Police Force.

Dr. Roddy first met Ramsey in the board room when Ramsey arrived to ask him some questions. Ramsey described Dr. Roddy as "unkempt." On the table in front of Dr. Roddy was "[a] large amount of wadded-up money," "a brown bottle with liquid in it," and the grey pill case. He observed what looked to him like a tattered gun permit and the pills from the pill case, which included what he identified as Oxycontin. Two other officers in the board room debriefed Ramsey. They explained that Dr. Roddy had emerged from his room wearing a white lab coat and that they had searched him. During the search, they found a gun, money, and pills. Ramsey asked Dr. Roddy about the gun and the cash he was carrying. Dr. Roddy said he was carrying the cash for the birthday trip. Ramsey also asked Dr. Roddy about the pills, and he replied that he was carrying the pills for him and his family. According to Ramsey, at no point did Dr. Roddy introduce himself, explain that he was a doctor, or say that he had a prescription for the pills. After this brief back-and-forth, Ramsey read Dr. Roddy his Miranda rights. Dr. Roddy invoked his

5

right to counsel, the questioning ended, and Ramsey arrested Roddy for possession of controlled substances.

After the arrest, Ramsey sought a search warrant for the Roddy hotel room. He sought the warrant because of the wadded-up cash, which looked like money he would seize from a drug dealer. He also noted that it was "irregular" that a hotel guest would have pulled a gun on another hotel guest. He inferred that the two were up to no good. He also sought the search warrant because of the Oxycontin, a controlled substance, present in the grey pill case.

A magistrate judge issued the search warrant for the hotel room. Ramsey returned to the hotel to conduct the search with the help of Officers Eddie McDaniel and Lucas of the Strategic Counter Drug team.

In the midst of the search, Ramsey returned to the lobby to find Wendy Roddy. Ramsey took Mrs. Roddy back to the hotel room. In the hotel room, Mrs. Roddy told Ramsey that she was "happy to talk to him" and that she "would answer any questions he had." Ramsey asked Mrs. Roddy various questions about her husband. She told Ramsey that her husband went by "Mike." Mrs. Roddy also testified that she gave Ramsey the name and phone number of her husband's physician, pharmacy, and others who would verify that he went by Mike.

Ramsey continued to ask Mrs. Roddy questions while he rifled through the contents of her purse. Ramsey emptied the purse onto one of the hotel room beds.

6

In the purse, he found a generic bottle of Ibuprofen. In the bottle, there were 99 Ibuprofen pills, 15 Metformin hydrochloride pills, 5 Clonazepam pills, 3 Mirtazapine pills, 1 Alprazolam pill, 1 Acetaminophen hydrocodone pill, less than 4 Focalin pills, 20 unknown white pills, and 1 unknown orange pill. Of those pills, Clonazepam and Alprazolam are controlled substances. Mrs. Roddy thought the unknown white pills might have been papaya enzymes or mints. The officers also found loose in her purse 1 Clonazepam pill, 3 Mirtazapine pills, 15 Adderall pills, 3 Metformin hydrochloride pills, 1 Alprazolam pill, 2 unknown pink pill fragments, and 10 unknown white pills. Mrs. Roddy did not have with her any prescriptions for those pills, except for the Focalin.

Ramsey placed Wendy under arrest. According to Ramsey, he read Mrs. Roddy her Miranda rights after finding the Alprazolam, Oxycontin, and Adderral. He also thought that she might have been under the influence because she was smiling and disengaged from questioning.

The officers recovered nearly 1000 pills in the Roddy hotel room, more than 300 of which were Oxycontin or Oxycodone. Save for one bottle of unknown white pills, Dr. Roddy testified that all of the pills in the room were for his family's use. Aside from the pills recovered from Dr. Roddy's pockets and from Mrs. Roddy's purse, the officers also found eight bottles of 90-count Oxycontin in various dosages and two bottles of 60-count Oxycodone prescribed to "Dr. Mike

7

Roddy" in Dr. Roddy's briefcase. Dr. Roddy did not object that he had these kinds of pills, but he did dispute how many pills were left in some of the bottles. Then again, he said it was possible he was mistaken about how many pills were left in each bottle because of his disorganized nature. According to Dr. Roddy, none of the bottles was prescribed to "William Roddy" because he goes by "Mike."

The officers recovered an additional $1,025 in cash and 14 other pill bottles from the briefcase. More than half of those bottles were unlabeled and contained a mixture of unknown white pills, Divalproex, Focalin, Alprazolam, Didanonine, Viagra, Carisoprodol, Methylphenidate, Oxycodone, Meperidine, Clonazepam, Dexmethylphenidate Hydrochloride, Valium, Pristiq, Lunesta, Doxycycline Hyclate, and Ambien. Dr. Roddy did not dispute that he possessed most of these pills, he disputed only that he had commingled different pills in the same bottle or that he would put pills in unlabeled bottles. Dr. Roddy disputed that he would have possessed Alprazolam because he did not prescribe that as a physician, but he offered no explanation for how the Alprazolam wound up in his briefcase. He also disputed that he would have possessed Meperidine, Clonazepam, Dexmethylphenidate Hydrochloride, and Valium. But the Roddys offered no explanation for what else those pills could be. The officers also recovered three pill bottles set on a table: a bottle containing 49 Prednisone pills; an unlabeled bottle containing 19 Depakote pills, 2 Fluoxetine pills, and 4 Trazodone pills; and an

8

Ibuprofen bottle. Dr. Roddy disputed that he would have mixed together the Depakote, Fluoxetine, and Trazodone, but did not dispute that those pills were his.

The officers transported Dr. Roddy and his wife to jail. Roddy alleges that at the jail he asked Ramsey to call his doctor or pharmacist. He also attempted to persuade him that he was known as "Mike" around town. Ramsey recalled only that Dr. Roddy asked him how much his bail was. Dr. Roddy wrote a check for $50,000 to post a bond to pay his and his wife's bail.

Days after the arrest of the Roddys, an Alabama Board of Medical Examiners employee, Jeff Grimsely, told Ramsey that William Roddy is also known as Mike Roddy. He faxed patient prescription summaries for William, Asher, and Cameron Roddy to Ramsey on March 25, 2010. That prescription summary did not contain any prescriptions for "Mike Roddy." But the pill bottles for "Mike Roddy" matched those prescriptions for "William Meyer Roddy." And the pill bottles for his sons matched those prescriptions for Cameron and Asher Roddy.

The day after Grimsely submitted the prescription histories, Ramsey formalized the arrest warrant. *See* Ala. R. Crim. P. 4.3(a)(2). The arrest warrant described their offense as "Trafficking – Heroin," Ala. Code § 13A-12-231(3). But no party contends that the officers found heroin either on Dr. Roddy or in the hotel room. In his deposition, Ramsey clarified that Oxycontin is a form of synthetic

9

heroin, *id.* §§ 20-2-23, 20-2-25, which likely explains why the warrant said "Heroin."

Ten months later, the district attorney decided not to prosecute the case. That decision was within the discretion of the district attorney, not the City of Huntsville Police Department.

After the dismissal of the charges, the Roddys alleged that Ramsey failed to return $200 he stole from Mrs. Roddy's purse and $75 he stole from one of their son's wallets on the day of the search. When they went to retrieve the evidence seized on the day of the search, they contended that $275 in cash and five passports were missing. Ramsey, on the other hand, contended that he confiscated only $900 from the briefcase and $125 from Mrs. Roddy's purse, which the officers later combined and returned to the family. The Roddys could not confirm the total amount of money that the police confiscated from the room the day of the search. And an internal investigation concluded that the Roddys' allegations were baseless.

The Roddys then filed this civil suit against the City of Huntsville and the officers involved in the search. They alleged that the City and the officers violated their Fourth Amendment right to be free from unreasonable search and seizure, 42 U.S.C. § 1983, and that the City and the officers committed various violations of state law, including false arrest, false imprisonment, malicious prosecution, conversion of the missing $275, and the tort of outrage. Dr. Roddy alleged that his

10

arrest and the search exacerbated his hypertension, caused posttraumatic stress, insomnia, loss of consortium, persistent headaches, humiliation, sexual dysfunction, stomach problems, dissipated physician referrals, and decimated his business. And Mrs. Roddy alleged that the incident caused her severe anxiety, damage to her reputation, and lack of sleep.

After the parties agreed to dismiss some of the defendants, the district court granted summary judgment in favor of the City and Officers Ramsey and Lucas. The district court concluded that Ramsey plainly had probable cause to seek a search warrant of the Roddy hotel room and that Lucas did not have any involvement in the execution of the search warrant. The district court also concluded that the City could not be liable if its officers were not liable. Likewise, the district court denied relief for the Roddys' claims of unlawful arrest. The district court reasoned that Ramsey "unquestionably" had at least arguable probable cause to arrest Roddy and that the pills found in the hotel room gave Ramsey at least arguable probable cause to arrest Mrs. Roddy. The district court further ruled that Lucas had no duty to intervene in any allegedly unlawful arrest, especially the arrest of Dr. Roddy for which he was not present. The district court also rejected all of the Roddys' state-law claims.

## II. STANDARD OF REVIEW

11

We review *de novo* a summary judgment granted by a district court and draw all inferences and review all evidence in the light most favorable to the nonmoving party. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). If the movant establishes that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Id.*

### III. DISCUSSION

We divide our discussion in three parts. First, we reject the Roddys' contention that the officers illegally searched their hotel room. Second, we reject the Roddys' argument that they were illegally arrested. And third, we decline to afford the Roddys any relief for the alleged violations of state law.

As an initial matter, the Roddys have abandoned any argument that Lucas or the City violated their Fourth Amendment rights. We therefore consider only the liability of Ramsey for the federal claims. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008). Likewise, the Roddys have abandoned any argument that the City is liable for any violations of state law. *Id.*

### A. *The Search of the Hotel Room*

The Roddys argue that the officers illegally searched their hotel room, even though Ramsey obtained a search warrant before entering the room. In particular, the Roddys argue that Ramsey lacked probable cause to seek that warrant because

12

he failed to confirm that Dr. Roddy did not have a prescription for the controlled substances in the grey pill box. They also argue that Ramsey made two misrepresentations in the affidavit he submitted for the search warrant: that Roddy "pulled a gun" on another hotel guest and that it is illegal to have prescription medicine in unlabeled containers. And they argue that Ramsey made three omissions in the affidavit: that Dr. Roddy lawfully possessed the controlled substances; that the Roddys had a ready way to verify their lawful possession; and that Ramsey had taken no action to discern whether the Roddys had prescriptions for the medicine.

We are unpersuaded. After all, Ramsey conducted the search after securing a warrant. An officer has probable cause for a search warrant when, "under the totality of the circumstances[,] 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2351 (1983)). That warrant "may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth," including material omissions. *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002).

The Roddys have failed to establish that the warrant was invalid. In the affidavit for the search warrant, Ramsey averred that when officers searched Dr.

13

Roddy, they found a loaded handgun, nearly $3900 in wadded-up cash, and an unlabeled container of pills including Oxycontin, Adderall, and Focalin. He also averred that this search was prompted by the initial call for help from the hotel after "an armed subject[, Roddy,] pulled a gun on another guest." Based on these facts, Ramsey suspected that Dr. Roddy was using his hotel room as a base of operations to sell drugs.

The Roddys' argument that the search warrant should have included more than these facts is unavailing. The Roddys dispute that Dr. Roddy "pulled a gun" on Meadows, but true or not, officers called Ramsey to the scene because of that accusation. And as Ramsey explained in his deposition, storing controlled substances in an unlabeled pill box was not illegal, but it led Ramsey to suspect that Dr. Roddy illegally possessed those drugs without a prescription. And when Ramsey sought the search warrant, Dr. Roddy stated only that the drugs were for his family, not that he had a prescription. To be sure, Dr. Roddy told other officers that he had a prescription, but not Ramsey. And Ramsey need not leave no stone unturned. *See Pickens v. Hollowell*, 59 F.3d 1203, 1208 (11th Cir. 1995) (explaining that officers need not "investigate independently every claim of innocence") (quoting *Baker v. McCollan*, 443 U.S. 137, 145–46, 99 S. Ct. 2689, 2695 (1979)). The search warrant was valid.

*B. Illegal Seizure*

14

The Roddys also allege that Ramsey violated their Fourth Amendment right to be free from unreasonable seizure when he arrested them. Dr. Roddy argues that Ramsey lacked arguable probable cause to arrest him for possession of controlled substances and drug trafficking. He contends that he informed police officers that he had prescriptions for the pills in the grey pill case, but that Ramsey failed to seek out those prescriptions. He also contends that Mrs. Roddy offered Ramsey contact information for the prescribing physician and pharmacy and that Mrs. Roddy repeatedly explained that Dr. Roddy went by "Mike." Likewise, Mrs. Roddy argues that Ramsey lacked arguable probable cause to arrest her for trafficking controlled substances. She contends that the officers found no Oxycontin or Oxycodone in her possession. She also contends that she had prescriptions for all of the medication in her purse and offered contact information for a physician and pharmacist to confirm those prescriptions.

"The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted— indeed, for every suspect released." *Baker*, 443 U.S. at 145, 99 S. Ct. at 2695. If facts and circumstances known to the officer would lead a prudent person to believe that a suspect has committed, is committing, or about to commit an offense, probable cause exists to arrest the suspect. *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). But when an officer asserts the defense of qualified

15

immunity, we ask whether there was *arguable* probable cause to arrest. *Pickens*, 59 F.3d at 1206; *Lindsey v. Storey*, 936 F.2d 554, 562 (11th Cir. 1991). We "must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest . . . ." *Von Stein*, 904 F.2d at 579. Importantly, we ask what information was known to the arresting officer at the time of the arrest, not those facts known to the plaintiff at the time of arrest or those facts discovered after the arrest. *Jones v. Cannon*, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999).

Isolating what Ramsey knew at the time he arrested Dr. Roddy, *id.*, he plainly had arguable probable cause to arrest him for possession of controlled substances. An officer told Ramsey that Dr. Roddy pulled a gun on another guest. Ramsey thought Dr. Roddy looked "unkempt." Ramsey observed Dr. Roddy's gun in the pile of items discovered during the search of Dr. Roddy, in addition to a pile of wadded-up cash totaling nearly $3,900, the brown bottle with liquid in it, and the grey, unlabeled pill case. Ramsey quickly identified that Dr. Roddy had Oxycontin in that unlabeled pill case, in addition to other controlled substances, Adderral and Focalin. Dr. Roddy said those pills were for his family, but never told Ramsey he had a prescription for them. Based on these facts, Ramsey had arguable probable cause to believe that Dr. Roddy possessed a controlled substance. Ala. Code §§ 13A-12-212, 20-2-25(1)a.

16

Ramsey also had arguable probable cause to arrest Mrs. Roddy for trafficking controlled substances. Trafficking requires that a suspect "knowingly [be] in actual or constructive possession of[] four grams or more of any . . . opium . . . as described in . . . Section 20-2-25(1)a." *Id.* § 13A-12-231(3). Oxycodone qualifies as an "opium." *Id.* § 20-2-25(1)a. To reiterate, at the time of her arrest, the officers eyed hundreds of Oxycontin and Oxycodone pills in Dr. Roddy's briefcase, some of which were prescribed to a "Mike Roddy." Mrs. Roddy complains that Ramsey continued to ignore her statements that William Roddy and Mike Roddy were the same person, but Ramsey testified that he had no reason to believe that they were. *See Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman, however, is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."). Moreover, the officers discovered Alprazolam, a controlled substance, in Mrs. Roddy's purse. Mrs. Roddy contests that Alprazolam was not hers, but offers no explanation for how it ended up in her purse. And after finding nearly $3,900 in wadded-up bills in Dr. Roddy's pockets, the officers found another $1,000 in the hotel room. All of these facts known to Ramsey at the time of the arrest amount to at least arguable probable cause that Mrs. Roddy had

17

committed, was committing, or was about to commit a drug-trafficking offense. *See Von Stein*, 904 F.2d at 579.

The Roddys make a related argument that when Ramsey formalized the arrest warrants in the days after the search, Ala. R. Crim. P. 4.3(a)(2), Ramsey failed to acknowledge the report from Grimsley, which documented the extensive prescription history of the Roddy family. They also object that Ramsey maintained his unfounded belief that William Roddy and Mike Roddy were not the same person. But the Roddys fail to allege that these omissions violated their Fourth Amendment right to be free from unreasonable seizure. After they were served with the warrants, the Roddys did not return to jail. And months later, the district attorney dropped the drug-trafficking charges altogether.

### C. State-Law Claims

We reject each of the Roddys' state-law claims. The Roddys argue that Ramsey and Lucas are liable for false arrest or false imprisonment. But, for the reasons explained above, Ramsey and Lucas had at least arguable probable cause for the arrest of Dr. Roddy and his wife and are entitled to state-agent immunity. *Borders v. City of Huntsville*, 875 So. 2d 1168, 1180 (Ala. 2003). The Roddys also argue that Ramsey subjected them to malicious prosecution. But it was up to the district attorney to prosecute the case against the Roddys, not Ramsey. *See Alabama Power Co. v. Neighbors*, 402 So. 2d 958, 962–63 (Ala. 1981). Ramsey

18

left the district attorney "to judge . . . the propriety of proceeding with the charge[s]" against the Roddys. *Id.* at 963 (quoting *Ryan v. Orient Ins. Co.*, 119 A. 423, 425 (Vt. 1923)). The Roddys also argue that Ramsey converted $275 from the Roddys, Ala. Code § 6-5-260, but neither of the Roddys could pin down how much money they had in the hotel room. Dr. Roddy "had a theory at best" that they were short $275. And when asked how much total money the officers took, Mrs. Roddy responded, "I don't know." Their claim that Ramsey failed to return $275 is based on pure speculation. Finally the Roddys argue that Ramsey is liable for the tort of outrage because his conduct during the investigation caused extreme emotional distress. But in Alabama, that tort has been limited to three circumstances— "wrongful conduct in the family-burial context," "barbaric methods employed to coerce an insurance settlement," and "egregious sexual harassment"—and we decline to add police conduct predicated on probable cause to that list. *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the City, Ramsey, and Lucas.