(Slip Opinion)     OCTOBER TERM, 2021     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOUSTON COMMUNITY COLLEGE SYSTEM *v.* WILSON

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–804.  Argued November 2, 2021—Decided March 24, 2022

In 2013, David Wilson was elected to the Board of Trustees of the Houston Community College System (HCC), a public entity that operates various community colleges.  Mr. Wilson often disagreed with the Board about the best interests of HCC, and he brought multiple lawsuits challenging the Board's actions.  By 2016, these escalating disagreements led the Board to reprimand Mr. Wilson publicly.  Mr. Wilson continued to charge the Board—in media outlets as well as in state-court actions—with violating its ethical rules and bylaws.  At a 2018 meeting, the Board adopted another public resolution, this one "censuring" Mr. Wilson and stating that Mr. Wilson's conduct was "not consistent with the best interests of the College" and "not only inappropriate, but reprehensible."  App. to Pet. for Cert. 44a.  The Board imposed penalties in addition to the verbal censure, among them deeming Mr. Wilson ineligible for Board officer positions during 2018.  Mr. Wilson amended the pleadings in one of his pending state-court lawsuits to add claims against HCC and the trustees under 42 U. S. C. § 1983, asserting that the Board's censure violated the First Amendment.  The case was removed to federal court, and the District Court granted HCC's motion to dismiss the complaint, concluding that Mr. Wilson lacked standing under Article III.  On appeal, a panel of the Fifth Circuit reversed, holding that Mr. Wilson had standing and that his complaint stated a viable First Amendment claim.  955 F. 3d 490, 496–497.  The Fifth Circuit concluded that a verbal "reprimand against an elected official for speech addressing a matter of public concern is an actionable First Amendment claim under § 1983."  *Id.*, at 498.  HCC sought review in this Court of the Fifth Circuit's judgment that Mr. Wilson may pursue a First Amendment claim based on a purely verbal

Syllabus

censure.

*Held*: Mr. Wilson does not possess an actionable First Amendment claim
arising from the Board's purely verbal censure.  Pp. 4–13.

    (a) The First Amendment prohibits laws "abridging the freedom of
speech."  When faced with a dispute about the Constitution's meaning
or application, "[l]ong settled and established practice is a considera-
tion of great weight."  *The Pocket Veto Case*, 279 U. S. 655, 689.  That
principle poses a problem for Mr. Wilson because elected bodies in this
country have long exercised the power to censure their members.  As
early as colonial times, the power of assemblies to censure their mem-
bers was assumed.  And, as many examples show, Congress has cen-
sured Members not only for objectionable speech directed at fellow
Members but also for comments to the media, public remarks disclos-
ing confidential information, and conduct or speech thought damaging
to the Nation.  Censures have also proven common at the state and
local level.  In fact, no one before the Court has cited any evidence sug-
gesting that a purely verbal censure analogous to Mr. Wilson's has ever
been widely considered offensive to the First Amendment.  Instead,
when it comes to disagreements of this sort, longstanding practice sug-
gests an understanding of the First Amendment that permits "[f]ree
speech on both sides and for every faction on any side."  *Thomas* v.
*Collins*, 323 U. S. 516, 547 (Jackson, J., concurring).  Pp. 4–7.

    (b) What history suggests, the Court's contemporary doctrine con-
firms.  A plaintiff like Mr. Wilson pursuing a First Amendment retali-
ation claim must show that the government took an "adverse action"
in response to his speech that "would not have been taken absent the
retaliatory motive."  *Nieves* v. *Bartlett*, 587 U. S. ___, ___.  To distin-
guish material from immaterial adverse actions, lower courts have
taken various approaches.  But any fair assessment of the materiality
of the Board's conduct in this case must account for at least two things.
First, Mr. Wilson was an elected official.  Elected representatives are
expected to shoulder a degree of criticism about their public service
from their constituents and their peers—and to continue exercising
their free speech rights when the criticism comes.  Second, the only
adverse action at issue before the Court is itself a form of speech from
Mr. Wilson's colleagues that concerns the conduct of public office.  The
First Amendment surely promises an elected representative like Mr.
Wilson the right to speak freely on questions of government policy, but
it cannot be used as a weapon to silence other representatives seeking
to do the same.  The censure at issue before us was a form of speech by
elected representatives concerning the public conduct of another
elected representative.  Everyone involved was an equal member of the
same deliberative body.  The censure did not prevent Mr. Wilson from
doing his job, it did not deny him any privilege of office, and Mr. Wilson

Syllabus

does not allege it was defamatory. Given the features of Mr. Wilson's case, the Board's censure does not qualify as a materially adverse action capable of deterring Mr. Wilson from exercising his own right to speak. Pp. 7–11.

(c) Mr. Wilson's countervailing account of the Court's precedent and history rests on a strained analogy between censure and exclusion from office. While Congress possesses no power to exclude duly elected representatives who satisfy the prerequisites for office prescribed in Article I of the Constitution, the power to exclude and the power to issue other, lesser forms of discipline "are not fungible" under the Constitution. *Powell* v. *McCormack*, 395 U. S. 486, 512. The differences between censure and exclusion from office undermine Mr. Wilson's attempt to rely on either *Bond* v. *Floyd*, 385 U. S 116, or the historical example he cites involving John Wilkes, both of which involved exclusion from office. Neither history nor this Court's precedents support finding a viable First Amendment claim here. Pp. 11–13.

955 F. 3d 490, reversed.

GORSUCH, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–804

HOUSTON COMMUNITY COLLEGE SYSTEM, PETITIONER *v.* DAVID BUREN WILSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 24, 2022]

JUSTICE GORSUCH delivered the opinion of the Court.

After years of acrimony, the Board of Trustees of the Houston Community College System censured one of its members, David Wilson. Mr. Wilson responded by filing a lawsuit challenging the Board's action. That suit now presents us with this question: Did the Board's censure offend Mr. Wilson's First Amendment right to free speech?

I

A

The Houston Community College System (HCC) is a public entity that operates various community colleges in Texas. Its Board of Trustees consists of nine members, each of whom is elected from a single-member district for a 6-year term. Mr. Wilson was elected to the Board in 2013. From the start, his tenure was a stormy one. Often and strongly, he disagreed with many of his colleagues about the direction of HCC and its best interests. Soon, too, he brought various lawsuits challenging the Board's actions. By 2016, these escalating disagreements led the Board to reprimand Mr. Wilson publicly. According to news reports, Mr. Wilson responded by promising that the Board's action

would "'never . . . stop me.'"  Brief for Petitioner 3, and nn. 3, 4.

Nor did it.  In the ensuing months, Mr. Wilson charged the Board in various media outlets with violating its bylaws and ethical rules.  He arranged robocalls to the constituents of certain trustees to publicize his views.  He hired a private investigator to surveil another trustee, apparently seeking to prove she did not reside in the district that had elected her.  He also filed two new lawsuits in state court.  In the first, Mr. Wilson alleged that the Board had violated its by-laws by allowing a trustee to vote via videoconference. When his colleagues excluded him from a meeting to dis-cuss the lawsuit, Mr. Wilson filed a second suit contending that the Board and HCC had "'prohibited him from per-forming his core functions as a Trustee.'"  Brief in Opposi-tion 8 (quoting Plaintiff's Original Pet. in No. 17–71693 (Tex. Dist. Ct., Oct. 24, 2017)).  All told, these two lawsuits cost HCC over $20,000 in legal fees.  That was on top of more than $250,000 in legal fees HCC incurred due to Mr. Wilson's earlier litigation.

At a 2018 meeting, the Board responded by adopting an-other public resolution, this one "censuring" Mr. Wilson. The resolution stated that Mr. Wilson's conduct was "not consistent with the best interests of the College" and "not only inappropriate, but reprehensible."  App. to Pet. for Cert. 44a.  The Board also imposed certain penalties.  It provided that Mr. Wilson was "ineligible for election to Board officer positions for the 2018 calendar year," that he was "ineligible for reimbursement for any College-related travel," and that his future requests to "access . . . funds in his Board account for community affairs" would require Board approval.  *Ibid.*  The Board further recommended that Mr. Wilson "complete additional training relating to governance and ethics."  *Id.*, at 44a–45a.

### B

Shortly after the Board adopted its second resolution, Mr. Wilson amended the pleadings in one of his pending state-court lawsuits, adding claims against HCC and the trustees under 42 U. S. C. § 1983. Among other things, Mr. Wilson asserted that the Board's censure violated the First Amendment. By way of remedy, he sought injunctive and declaratory relief as well as damages for mental anguish, punitive damages, and attorney's fees.

Years of legal twists and turns followed. HCC and the trustees removed the case to federal court. Mr. Wilson then amended his complaint to drop his colleagues from the suit, leaving HCC as the sole defendant. Eventually, HCC moved to dismiss the complaint. The District Court granted the motion, concluding that Mr. Wilson lacked standing under Article III. On appeal, a panel of the Fifth Circuit reversed, holding that Mr. Wilson had standing and that his complaint stated a viable First Amendment claim. 955 F. 3d 490, 496–497 (2020).

The Fifth Circuit's merits analysis proceeded in two steps. First, the court concluded that a verbal "reprimand against an elected official for speech addressing a matter of public concern is an actionable First Amendment claim under § 1983." *Id.*, at 498. Next, the court reasoned that the Board's imposition of other punishments—such as limiting Mr. Wilson's eligibility for officer positions and his access to certain funds—did "not violate his First Amendment rights" because Mr. Wilson did not have an "entitlement" to those privileges. *Id.*, at 499, n. 55. In sum, the court held that Mr. Wilson's § 1983 action could proceed, but only as to the Board's unadorned censure resolution. HCC's request for rehearing en banc failed by an equally divided vote. 966 F. 3d 341 (CA5 2020).

In time, HCC filed a petition for certiorari in this Court. It asked us to review the Fifth Circuit's judgment that Mr. Wilson may pursue a First Amendment claim based on a

purely verbal censure. Last year, we agreed to take up that question. 593 U. S. ___ (2021). But as merits briefing unfolded, Mr. Wilson did not just seek to defend the Fifth Circuit's judgment; he also sought to challenge it in part. Specifically, he argued that the Fifth Circuit erred to the extent that it upheld the Board's nonverbal punishments as consistent with the First Amendment. Generally, however, when a respondent in this Court seeks to alter a lower court's judgment, he must file and we must grant a cross-petition for review. See *Genesis HealthCare Corp.* v. *Symczyk*, 569 U. S. 66, 72 (2013). Mr. Wilson filed no such petition in this case. As a result, we decline to take up his challenge to the Fifth Circuit's judgment, and the only question before us remains the narrow one on which we granted certiorari: Does Mr. Wilson possess an actionable First Amendment claim arising from the Board's purely verbal censure?

## II
### A

The First Amendment prohibits laws "abridging the freedom of speech." One obvious implication of that rule is that the government usually may not impose prior restraints on speech. See *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 718–720 (1931). But other implications follow too. Relevant here, no one before us questions that, "[a]s a general matter," the First Amendment prohibits government officials from subjecting individuals to "retaliatory actions" after the fact for having engaged in protected speech. *Nieves* v. *Bartlett*, 587 U. S. ___, ___ (2019) (slip op., at 5) (internal quotation marks omitted); see also *Hartman* v. *Moore*, 547 U. S. 250, 256 (2006). Mr. Wilson argues that the Board's censure resolution represents exactly that kind of impermissible retaliatory action.

Almost immediately, however, this submission confronts

a challenge. When faced with a dispute about the Constitution's meaning or application, "[l]ong settled and established practice is a consideration of great weight." *The Pocket Veto Case*, 279 U. S. 655, 689 (1929). Often, "a regular course of practice" can illuminate or "liquidate" our founding document's "terms & phrases." Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908); see also *McCulloch* v. *Maryland*, 4 Wheat. 316, 401 (1819); The Federalist No. 37, p. 229 (C. Rossiter ed. 1961) (J. Madison). That principle poses a problem for Mr. Wilson because elected bodies in this country have long exercised the power to censure their members. In fact, no one before us has cited any evidence suggesting that a purely verbal censure analogous to Mr. Wilson's has ever been widely considered offensive to the First Amendment.

As early as colonial times, the power of assemblies in this country to censure their members was "more or less assumed." M. Clarke, Parliamentary Privilege in the American Colonies 184 (1943). It seems, too, that assemblies often exercised the power to censure members for views they expressed and actions they took "both within and without the legislature." D. Bowman & J. Bowman, Article I, Section 5: Congress' Power to Expel—An Exercise in Self-Restraint, 29 Syracuse L. Rev. 1071, 1084–1085 (1978) (footnote omitted).

The parties supply little reason to think the First Amendment was designed or commonly understood to upend this practice. To the contrary, the United States Senate issued its first censure in 1811, after a Member read aloud a letter from former President Jefferson that the body had placed under an "injunction of secrecy." 22 Annals of Cong. 65–83. The House of Representatives followed suit in 1832, censuring one of its own for "insulting . . . the Speaker." 2 A. Hinds, Precedents of the House of Representatives § 1248,

pp. 799–800 (1907) (Hinds). Ten years later, the House reprimanded another Member after he introduced a resolution thought to be damaging to international relations. *Id.*, § 1256, at 807–808.

Many later examples followed these early ones. In 1844, the Senate issued a censure after a Member divulged to the New York Evening Post a confidential message from President Tyler "outlin[ing] the terms of an annexation agreement with Texas." U. S. Senate Historical Office, A. Butler & W. Wolff, United States Senate: Election, Expulsion, and Censure Cases 1793–1990, p. 47 (1995). During the Civil War, Congress censured several Members for expressing support for the Confederacy. See Hinds § 1253, at 803–804 (censure of Rep. Alexander Long); *id.*, § 1254, at 804–805 (censure of Rep. Benjamin G. Harris). In 1954, the Senate "condemned" Senator Joseph McCarthy for bringing "the Senate into dishonor," citing his conduct and speech both within that body and before the press. 100 Cong. Rec. 16392; see also Butler, United States Senate, at 404–407. The House and Senate continue to exercise the censure power today. See, *e.g.*, Congressional Research Service, J. Maskell, Expulsion, Censure, Reprimand, and Fine: Legislative Discipline in the House of Representatives 20 (2016) (documenting censures in the House through 2016). And, as these examples lay bare, Congress has censured Members not only for objectionable speech directed at fellow Members but also for comments to the media, public remarks disclosing confidential information, and conduct or speech thought damaging to the Nation.

If anything, censures along these lines have proven more common yet at the state and local level. As early as 1833, Justice Story observed that even "[t]he humblest assembly" in this country historically enjoyed the power to prescribe rules for its own proceedings. 2 Commentaries on the Constitution of the United States § 835, p. 298. And throughout our history many state and local bodies have employed that

authority to prescribe censure processes for their members. See Brief for Petitioner 23–28 (collecting examples). Today, the model manual of the National Conference of State Legislatures contemplates just such procedures too. See Mason's Manual of Legislative Procedure § 561.1 (2020). According to HCC and undisputed by Mr. Wilson, it seems elected bodies in this country issued no fewer than 20 censures in August 2020 alone. See Pet. for Cert. 19–21.

If this longstanding practice does not "put at rest" the question of the Constitution's meaning for the dispute before us, it surely leaves a "considerable impression." *McCulloch*, 4 Wheat., at 401. On Mr. Wilson's telling and under the Fifth Circuit's holding, a purely verbal censure by an elected assembly of one of its own members may offend the First Amendment. Yet we have before us no evidence suggesting prior generations thought an elected representative's speech might be "abridg[ed]" by that kind of countervailing speech from his colleagues. U. S. Const., Amdt. 1. Instead, when it comes to disagreements of this sort, history suggests a different understanding of the First Amendment—one permitting "[f]ree speech on both sides and for every faction on any side." *Thomas* v. *Collins*, 323 U. S. 516, 547 (1945) (Jackson, J., concurring).

B

What history suggests, we believe our contemporary doctrine confirms. Under this Court's precedents, a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an "adverse action" in response to his speech that "would not have been taken absent the retaliatory motive." *Nieves*, 587 U. S., at \_\_\_ (slip op., at 5). Some adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment. See *id.*, at \_\_\_–\_\_\_ (slip op., at 4–5) (arrest); *Hartman*, 547 U. S., at 256 (prosecution); *Perry*

v. *Sindermann*, 408 U. S. 593, 596–597 (1972) (employ-ment). "[D]eprivations less harsh than dismissal" can sometimes qualify too. *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 75 (1990). At the same time, no one would think that a mere frown from a supervisor constitutes a suf-ficiently adverse action to give rise to an actionable First Amendment claim.

To distinguish material from immaterial adverse actions, lower courts have taken various approaches. Some have asked whether the government's challenged conduct would "chill a person of ordinary firmness" in the plaintiff's posi-tion from engaging in "future First Amendment activity." *Nieves*, 587 U. S., at ___ (slip op., at 4) (internal quotation marks omitted). Others have inquired whether a retalia-tory action "adversely affected the plaintiff's . . . protected speech," taking into account things like the relationship be-tween speaker and retaliator and the nature of the govern-ment action in question. *Suarez Corp. Industries* v. *McGraw*, 202 F. 3d 676, 686 (CA4 2000). But whether viewed through these lenses or any other, it seems to us that any fair assessment of the materiality of the Board's conduct in this case must account for at least two things.

First, Mr. Wilson was an elected official. In this country, we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers—and to continue exercising their free speech rights when the criticism comes. As this Court has put it, "[w]hatever differences may exist about interpreta-tions of the First Amendment, there is practically universal agreement" that it was adopted in part to "protect the free discussion of governmental affairs." *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966). When individuals "consent to be a candidate for a public office conferred by the election of the people," they necessarily "pu[t] [their] character in issue, so far as it may respect [their] fitness and qualifications for the office." *White* v. *Nicholls*, 3 How. 266, 290 (1845).

Second, the only adverse action at issue before us is itself a form of speech from Mr. Wilson's colleagues that concerns the conduct of public office. The First Amendment surely promises an elected representative like Mr. Wilson the right to speak freely on questions of government policy. But just as surely, it cannot be used as a weapon to silence other representatives seeking to do the same. The right to "examin[e] public characters and measures" through "free communication" may be no less than the "guardian of every other right." Madison's Report on the Virginia Resolutions (Jan. 7, 1800), in 17 Papers of James Madison 345 (D. Mattern, J. Stagg, J. Cross, & S. Perdue eds. 1991). And the role that elected officials play in that process "'makes it all the more imperative that they be allowed to freely express themselves.'" *Republican Party of Minn.* v. *White*, 536 U. S. 765, 781 (2002).

Given these features of Mr. Wilson's case, we do not see how the Board's censure could qualify as a materially adverse action consistent with our case law. The censure at issue before us was a form of speech by elected representatives. It concerned the public conduct of another elected representative. Everyone involved was an equal member of the same deliberative body. As it comes to us, too, the censure did not prevent Mr. Wilson from doing his job, it did not deny him any privilege of office, and Mr. Wilson does not allege it was defamatory. At least in these circumstances, we do not see how the Board's censure could have materially deterred an elected official like Mr. Wilson from exercising his own right to speak.

Mr. Wilson's behavior and concessions seem telling. Recall that, after the Board's first reprimand, Mr. Wilson did not exactly cower silently. Indeed, before us Mr. Wilson does not argue that the Board's initial resolution interfered with his free speech rights in any way. Instead, he confines his attack to the Board's second reprimand. And even when

it comes to that resolution, he does not quibble with its contents. Mr. Wilson does not suggest, for example, that the Board's criticism of him for "inappropriate" and "reprehensible" behavior materially deterred him from speaking his mind. Instead, he submits that the Board's second resolution offended the First Amendment only because it was denominated a disciplinary "censure." So on Mr. Wilson's telling, it seems everything hinges on a subtlety: A reprimand no matter how strongly worded does not materially impair the freedom of speech, but a disciplinary censure does. That much we find hard to see. Doubtless, by invoking its "censure" authority in the second resolution the Board added a measure of sting. But we cannot see how that alone changed the equation and materially inhibited Mr. Wilson's ability to speak freely.

In rejecting Mr. Wilson's claim, we do not mean to suggest that verbal reprimands or censures can never give rise to a First Amendment retaliation claim. It may be, for example, that government officials who reprimand or censure students, employees, or licensees may in some circumstances materially impair First Amendment freedoms. See generally *Ibanez* v. *Florida Dept. of Business and Professional Regulation, Bd. of Accountancy*, 512 U. S. 136, 139 (1994) (licensing); *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 655–656 (1985) (same); *Holloman* v. *Harland*, 370 F. 3d 1252, 1268–1269 (CA11 2004) (student); *Kirby* v. *Elizabeth City*, 388 F. 3d 440, 449 (CA4 2004) (employee). Likewise, we do not address today questions concerning legislative censures accompanied by punishments, or those aimed at private individuals. Cf. *Kilbourn* v. *Thompson*, 103 U. S. 168, 189–190 (1881) (distinguishing Congress's power to inflict certain punishments on its own Members from its power to punish nonmembers). Nor do we pass on the First Amendment implications of censures or reprimands issued by government bodies against government officials who do not serve as

members of those bodies.  See, *e.g.*, *Jenevein* v. *Willing*, 493 F. 3d 551, 560–561 (CA5 2007); *Scott* v. *Flowers*, 910 F. 2d 201, 211–213 (CA5 1990).

History could hold different lessons for cases like these, too.  For example, following the Whiskey Rebellion, Federalists supported by President Washington introduced a proposal in Congress to denounce "self-created societies" they believed had "'misrepresent[ed] the conduct of the Government.'"  4 Annals of Cong. 899 (1794).  James Madison and others opposed, and ultimately defeated, the effort in the House of Representatives.  In doing so Madison insisted that, in a Republic like ours, "the censorial power is in the people over the Government, and not in the Government over the people."  *Id.*, at 934; see also R. Chesney, Democratic-Republican Societies, Subversion, and the Limits of Legitimate Political Dissent in the Early Republic, 82 N. C. L. Rev. 1525, 1560–1566 (2004).  When the government interacts with private individuals as sovereign, employer, educator, or licensor, its threat of a censure could raise First Amendment questions.  But those cases are not this one.

C

Mr. Wilson offers a countervailing account of our precedent and history, but all of it rests on a strained analogy.  To start, he directs us to *Bond* v. *Floyd*, 385 U. S. 116 (1966).  There, a state legislature refused to seat a duly elected representative.  According to the legislature, the representative's comments criticizing the Vietnam War were incompatible with the State's required loyalty oath.  This Court held that the legislature's action violated the First Amendment.  *Id.*, at 135.  And, Mr. Wilson reasons, we must reach the same result here.  But that much does not follow quite as seamlessly as Mr. Wilson suggests.  The legislature's action in *Bond* implicated not only the speech of an elected official, it also implicated the franchise of his constituents.  And it involved not just counterspeech from

colleagues but exclusion from office.  See *id.*, at 123–125.

Just three years after *Bond*, the Court stressed the salience of these differences.  In *Powell* v. *McCormack*, the Court held that Congress possesses no power to exclude duly elected representatives who satisfy the prerequisites for office prescribed in Article I of the Constitution.  395 U. S. 486, 550 (1969).  In doing so, however, the Court took pains to emphasize that the power to exclude and the power to issue other, lesser forms of discipline "are not fungible" under our Constitution.  *Id.*, at 512; see also *id.*, at 551–553 (Douglas, J., concurring).  Mr. Wilson's attempt to analogize his case to *Bond* thus conflates a distinction *Powell* cautioned us not to confuse.

The differences between exclusion and censure also undermine Mr. Wilson's alternative argument—this one concerning John Wilkes.  In 1763, Wilkes "published an attack on a recent [English] peace treaty with France, calling it the product of bribery and condemning the Crown's ministers as the tools of despotism and corruption." *Powell*, 395 U. S., at 527 (internal quotation marks omitted).  Parliament responded by expelling Wilkes from office and later refusing to seat him despite his repeated reelection.  *Id.*, at 527–528.  Only in 1782 did Parliament finally relent, voting to expunge its prior resolutions and resolving that its actions had been "subversive of the rights of the whole body of electors of this kingdom." *Id.*, at 528 (internal quotation marks omitted).

According to Mr. Wilson, the Wilkes affair demonstrates that legislative censures are at odds with the American legal tradition.  But, once more, this argument stretches a historical analogy too far.  The framers may well have had the Wilkes episode in mind when they crafted Clauses in the Constitution limiting Congress's ability to impose its own ad hoc qualifications for office or to expel Members.  See U. S. Const., Art. I, §§ 2–3, 5; see also *Powell*, 395 U. S.,

at 531–539. Undoubtedly, too, the first set of these constitutional limitations ultimately led the Court in *Powell* to hold that the House of Representatives may not "exclude members-elect for general misconduct not within [the Constitution's] standing qualifications." *Id.*, at 528. But Mr. Wilson cites nothing in the Wilkes affair to support his much more ambitious suggestion that the founding generation understood the First Amendment to prohibit representative bodies from censuring members as the Board did here. If anything, as we have seen, history counsels a very different conclusion.

\*

Our case is a narrow one. It involves a censure of one member of an elected body by other members of the same body. It does not involve expulsion, exclusion, or any other form of punishment. It entails only a First Amendment retaliation claim, not any other claim or any other source of law. The Board's censure spoke to the conduct of official business, and it was issued by individuals seeking to discharge their public duties. Even the censured member concedes the content of the censure would not have offended the First Amendment if it had been packaged differently. Neither the history placed before us nor this Court's precedents support finding a viable First Amendment claim on these facts. Argument and "counterargument," not litigation, are the "weapons available" for resolving this dispute. *Wood* v. *Georgia*, 370 U. S. 375, 389 (1962). The judgment of the Fifth Circuit is

*Reversed.*