# SUPREME COURT OF THE UNITED STATES

─────────

No. 24A1051

─────────

## LAUREL D. LIBBY, ET AL. *v.* RYAN M. FECTEAU, SPEAKER OF THE MAINE HOUSE OF REPRESENTATIVES, ET AL.

ON APPLICATION FOR INJUNCTION

[May 20, 2025]

The application for injunction pending appeal presented to JUSTICE JACKSON and by her referred to the Court is granted pending disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of the petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court.

JUSTICE SOTOMAYOR would deny the application.

JUSTICE JACKSON, dissenting from the grant of the application for injunction.

I would deny the application.

These applicants seek an injunction pending appeal. "The All Writs Act, 28 U. S. C. §1651(a), is the only source of this Court's authority to issue [such] an injunction." *Turner Broadcasting System, Inc.* v. *FCC*, 507 U. S. 1301, 1303 (1993) (Rehnquist, C. J., in chambers). And under our well-established rules, relief of this sort "is not a matter of right, but of discretion sparingly exercised." Supreme Court Rule 20.1. We have long recognized that this injunctive relief is appropriate only when "critical and exigent circumstances" exist necessitating intervention "in aid of [our]

jurisdictio[n],” and the applicants’ entitlement to relief is “indisputably clear.” *Wisconsin Right to Life, Inc.* v. *Federal Election Comm’n*, 542 U. S. 1305, 1306 (2004) (Rehnquist, C. J., in chambers) (internal quotation marks omitted). In my view, these applicants have not met this high bar.

First, the applicants have failed to show that there exist “critical and exigent circumstances” necessitating intervention “in aid of [our] jurisdictio[n],” *ibid.*—what I have elsewhere called a “line-jumping justification,” *Labrador* v. *Poe*, 601 U. S. \_\_\_, \_\_\_ (2024) (opinion dissenting from grant of stay) (slip op., at 1). The First Circuit is moving quickly to evaluate the legal issues this case presents, with oral argument scheduled to occur in a few weeks. Meanwhile, before us, the applicants have not asserted that there are any significant legislative votes scheduled in the upcoming weeks; that there are any upcoming votes in which Libby’s participation would impact the outcome; or that they will otherwise suffer any concrete, imminent, and significant harm while the lower court considers this matter.

Second, the applicants have not satisfied our normal certiorari factors, such as demonstrating the need to resolve a circuit split. Supreme Court Rule 10. Instead, they request highly fact-specific error correction concerning a question of first impression that is unlikely to recur. We have long recognized that, to avoid end runs around the ordinary certiorari process, emergency relief should not be granted if the Court would have been unlikely to grant review of the matter in any event. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); *Does* v. *Mills*, 595 U. S. \_\_\_, \_\_\_ (2021) (BARRETT, J., concurring in denial of application for injunctive relief ) (slip op., at 1). Denying emergency relief in a case that does not satisfy the usual certiorari factors also avoids creating perverse incentives to seek our intervention prematurely—why would any applicant who thinks the lower courts are mistaken wait for those courts’ final

word on an issue if real-time error correction via our emergency docket is readily available?

Third, these applicants have failed to demonstrate that their right to this relief is "'indisputably clear.'" *Wisconsin Right to Life*, 542 U. S., at 1306. The Rules of the Maine House of Representatives—adopted by the 132d Maine Legislature long before the events at issue here took place—contemplate stripping a legislative member of the ability to vote as a sanction for certain ethical violations. See 2025 WL 1148726, *2 (D Me., Apr. 18, 2025). The House determined that Representative Libby violated those rules, thereby triggering this sanction, when she engaged in behavior that a majority of the House determined "may endanger [a] minor." H. Res. in No. 1:25–cv–83 (D Me., Apr. 1, 2025), ECF Doc. 29–4, p. 1.

Whether the House's censure and resulting sanction violate Libby's constitutional rights, or those of her constituents, raises many difficult questions. What are the limits on a state legislature's ability to bind its members to ethics rules? Do federal courts have the authority to determine that those rules are improper? Does it violate a representative's First Amendment rights to be subject to sanction under such rules, and does it make a difference what the sanction is? What rights does the Federal Constitution give constituents to override the enforcement of ethics rules of their state legislature? Does a federal court have the power to enjoin state representatives from enforcing a state legislature's ethics rules? And may the court enjoin legislative employees from carrying out the will of the state legislature with respect to that enforcement?

This Court has neither addressed nor answered most of these questions. See, *e.g.*, *Houston Community College System* v. *Wilson*, 595 U. S. 468, 482–483 (2022) (declining to consider whether a censure accompanied by punishment could constitute First Amendment retaliation). Others im-

plicate tensions in our precedent that lack an obvious resolution. Compare *Powell* v. *McCormack*, 395 U. S. 486, 504–506 (1969) (legislative immunity does not bar suit against nonrepresentative employees), with *Gravel* v. *United States*, 408 U. S. 606, 618 (1972) (legislative immunity extends to acts of nonlegislators "insofar as the conduct of the [employee] would be a protected legislative act if performed by the Member himself ").

It is certainly possible that the applicants have the better of the arguments on the merits of their claims. But in the absence of binding precedent on any of these issues, their right to relief is not clear, let alone indisputably so.

\* \* \*

Not very long ago, this Court treaded carefully with respect to exercising its equitable power to issue injunctive relief at the request of a party claiming an emergency. The opinions are legion in which individual Justices, reviewing such requests in chambers, declined to intervene—reiterating that "such power should be used sparingly and only in the most critical and exigent circumstances." *Williams* v. *Rhodes*, 89 S. Ct. 1, 2, 21 L. Ed. 2d 69 (1968) (Stewart, J., in chambers); see also *Ohio Citizens for Responsible Energy, Inc.* v. *NRC*, 479 U. S. 1312, 1313 (1986) (Scalia, J., in chambers); *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (ROBERTS, C. J., concurring in denial of application for injunctive relief ) (slip op., at 1–2).

Those days are no more. Today's Court barely pauses to acknowledge these important threshold limitations on the exercise of its own authority. It opts instead to dole out error correction as it sees fit, regardless of the lack of any exigency and even when the applicants' claims raise significant legal issues that warrant thorough evaluation by the lower courts that are dutifully considering them.

I think this clear departure from past practice is both inequitable and unwise. For one thing, the Court's failure to articulate clear standards for when emergency relief is appropriate makes it difficult to confidently conclude that any such standards are actually being referenced and applied evenhandedly. Cf. *Merrill* v. *Milligan*, 595 U. S. \_\_\_, \_\_\_–\_\_\_ (2022) (KAGAN, J., dissenting from grant of applications for stays) (slip op., at 11–12) (observing that our ordinary appellate processes "serve both to constrain and to legitimate the Court's authority"). Also, as a practical matter, it is plainly prudent to reserve our emergency docket for applicants who demonstrate that they truly *need* our help *now*. In the absence of that showing, we can, and should, allow even applicants with credible merits claims to litigate their arguments in the lower courts before we get involved. Cf. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) (demonstrating that, at least sometimes, we opt to proceed as if "we are a court of review, not of first view").

The watering down of our Court's standards for granting emergency relief is, to me, an unfortunate development. After all, the manner in which we handle emergency applications—"on a short fuse without benefit of full briefing and oral argument," *Does*, 595 U. S., at \_\_\_ (opinion of BARRETT, J.) (slip op., at 1)—is hardly a model for sound decisionmaking. At the very least, by lowering the bar for granting emergency relief, the Court itself will bear responsibility for the resulting systemic disruption, as a surge in requests for our "extraordinary" intervention—at earlier and earlier stages of ongoing lower court proceedings, and with greater and greater frequency—will undoubtedly follow.