RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CALVIN LYNDELL DIBRELL,

　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

THE CITY OF KNOXVILLE, TENNESSEE; OFFICER JOEY
WHITEHEAD, OFFICER THOMAS TURNER, OFFICER
RICHARD WHITE, OFFICER JOHN PICKENS, OFFICER
FRED KIMBER, OFFICER CHRISTOPHER JONES, OFFICER
BRIAN BALDWIN, and OFFICER HORACE LANE,
Individually and in their official capacities,

　　　　　　　　　*Defendants-Appellees*.

No. 20-5528

─────────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:18-cv-00397—Harry S. Mattice, Jr., District Judge.

Decided and Filed:  January 8, 2021

Before:  SUTTON, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:**  Terrell L. Tooten, Cordova, Tennessee, for Appellant.  Ronald E. Mills, CITY OF
KNOXVILLE, Knoxville, Tennessee, for Appellee City of Knoxville.  E. Jerome Melson,
GENTRY, TIPTON & MCLEMORE, P.C., Knoxville, Tennessee, for Appellees Whitehead,
Turner, White, Pickens, Kimber, Jones, Baldwin, and Lane, in their individual capacities.

─────────────────

## OPINION

─────────────────

　　MURPHY, Circuit Judge.  The Supreme Court has repeatedly said that courts should
look to the common law to establish the rules for constitutional claims under 42 U.S.C. § 1983

because the statute "creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (citation omitted). Yet the Court has just as repeatedly said that § 1983 does not permit courts to create rights in common-law fashion because the statute merely vindicates rights found elsewhere—in the Constitution or other federal laws. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). This case requires us to grapple with how the first principle comports with the second.

Police officers with the City of Knoxville detained Calvin Dibrell and found drugs in his possession. The state convicted him of drug-trafficking offenses. An appellate court reversed, finding that the officers violated the Fourth Amendment by detaining Dibrell without reasonable suspicion before uncovering the drugs. Dibrell brought two Fourth Amendment claims against the officers under § 1983: one for "false arrest" and "false imprisonment" and the other for "malicious prosecution." Yet the Fourth Amendment does not codify the common law of torts; it prohibits "unreasonable" "seizures." Dibrell's claims thus shared a common *constitutional* premise: that he was detained (seized) without probable cause or reasonable suspicion to believe that he committed a crime. Section 1983 nevertheless establishes different *statutory* rules depending on the type of seizure. And Dibrell's challenge to his initial seizure was untimely under § 1983's rules governing the accrual of a claim—even if, as the state court believed, a portion of this seizure violated the Fourth Amendment. His malicious-prosecution claim, by contrast, fails on its constitutional merits because the state had probable cause to initiate the criminal case once the officers found the drugs. We thus affirm the grant of summary judgment to the officers and the city.

I

This case comes on the heels of Tennessee's prosecution of Dibrell. *See State v. Dibrell*, 2018 WL 1474226, at *1 (Tenn. Crim. App. Mar. 26, 2018). On the afternoon of February 17, 2014, Officer Joey Whitehead with the Knoxville Police Department took his police cruiser to a car wash. *Id.* While there, an unknown person flagged Whitehead down and claimed that a man named Calvin Dibrell was selling drugs out of his Chrysler 300 at a nearby Walgreens. *Id.* Whitehead relayed this tip to three colleagues: Officers Thomas Turner, Richard White, and John Pickens. *Id.*

These officers arrived at the Walgreens and stopped their cruisers in a manner that blocked in the Chrysler. Dibrell was sitting in its driver's seat. *Id.* An officer approached the car and spoke with Dibrell for a minute before asking him to get out. *Id.* at *7. Dibrell obliged. *Id.* The officer patted Dibrell down for weapons and told him to "hang tight" on the sidewalk. *Id.* Officers casually conversed with Dibrell for the next three minutes or so until Officer Whitehead arrived with his police dog. *Id.* at *7–8. Upon Whitehead's arrival, his dog took two laps around Dibrell's car. *Id.* at *8. Whitehead asserted that the dog alerted to the smell of drugs. *Id.*

Relying on the alert, the officers searched the Chrysler. *Id.* at *2. They found three pill bottles inside. *Id.* The first contained 9 hydrocodone pills; the second, 40 oxycodone pills; and the third, 42 alprazolam pills. *Id.* The officers suspected that Dibrell had been illegally selling these drugs because the drugs did not match the labels on their respective bottles. *Id.* They searched Dibrell and found a bag with 30 more oxycodone pills and around $800. *Id.* They arrested him. *Id.* at *3. He was released on bond the next day.

Fifteen months later, in April 2015, a grand jury indicted Dibrell on twelve drug-trafficking counts under Tennessee law. *Id.* at *1. He moved to suppress the drugs and money uncovered by the officers, arguing that they lacked reasonable suspicion to detain him while waiting for the police dog to arrive. *Id.* at *9. The state trial court denied Dibrell's motion, reasoning that the officers had not detained Dibrell before the dog sniff. *Id.* at *5–6. In June 2016, a jury convicted Dibrell. *Id.* at *4. The trial court sentenced him to 12 years' imprisonment. *Id.* at *1, *4.

In March 2018, an appellate court vacated Dibrell's convictions. *Id.* at *15. The court found that the officers had seized Dibrell before the dog sniff and that the anonymous tip did not give them reasonable suspicion to do so. *Id.* at *9–14. It held that the trial court should have suppressed the drugs under the Fourth Amendment and dismissed the charges. *Id.* at *14. Dibrell was released the next month.

In September 2018, Dibrell sued the City of Knoxville, the officers involved in his arrest (Whitehead, Turner, White, and Pickens), and four other officers (Fred Kimber, Christopher

Jones, Brian Baldwin, and Horace Lane). The district court granted summary judgment to the officers and the city. It rejected Dibrell's constitutional claims under 42 U.S.C. § 1983 on statute-of-limitations grounds or on the merits. Dibrell also sued the defendants under 42 U.S.C. § 1985, alleging that they conspired to violate his rights because he is African American. But the court recognized that the "intracorporate conspiracy doctrine" bars a § 1985 claim alleging that members of a collective entity (like the officers and the city) conspired with each other. The court lastly declined supplemental jurisdiction over Dibrell's state-law tort claims.

On appeal, Dibrell challenges only the dismissal of his § 1983 claims. We review the district court's decision de novo. *Pineda v. Hamilton County*, 977 F.3d 483, 489 (6th Cir. 2020).

II

A. Claims Against the Officers

Section 1983 "makes 'liable' '[e]very person' who 'under color of' state law 'subjects, or causes to be subjected,' another person 'to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]'" *Id.* (quoting 42 U.S.C. § 1983). Although the Supreme Court has noted that this statute "creates a species of tort liability," *Heck*, 512 U.S. at 483 (citation omitted), it does not mean that § 1983 allows us to create and amend rights in common-law fashion. In fact, § 1983 contains no substantive rights. It merely provides a vehicle for vindicating rights found in the Constitution or another federal law. *Graham*, 490 U.S. at 393–94. And whether a defendant has violated a constitutional right turns on the meaning of the constitutional text, not on the common law of torts. *See id.* at 394. So our "threshold inquiry" under § 1983 must always be "to 'identify the specific constitutional right' at issue." *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017) (citation omitted).

Once we identify the right, we must then consider the statutory "elements of, and rules associated with, an action seeking damages for its violation" under § 1983. *Id.* When, for instance, does a § 1983 claim accrue? *Wallace v. Kato*, 549 U.S. 384, 388 (2007). What are the available damages? *Carey v. Piphus*, 435 U.S. 247, 257–58 (1978). What is the statute of limitations? *Wilson v. Garcia*, 471 U.S. 261, 266–79 (1985). We will not find answers to these questions in the Constitution. The answers must come from the statute. And we look to the

general "common law of torts" to set the statutory rules for § 1983 claims. *Manuel*, 137 S. Ct. at 920. If federal law does not provide a clear answer, we may also sometimes incorporate the common law of the specific state in which a suit is brought. 42 U.S.C. § 1988(a); *Wilson*, 471 U.S. at 267–80.

How does this two-step approach play out here? Dibrell's complaint makes our "threshold inquiry" difficult because it alleges that the officers violated his constitutional rights in the abstract without citing any specific right. *Manuel*, 137 S. Ct. at 920. Many of his allegations—such as the claim that he was arrested without probable cause—might suggest that he intends to invoke the Fourth Amendment. *See id.* at 917–20. But others—such as the claim that the officers lied at his trial—might suggest that he intends to rely on the Due Process Clause. *See McDonough v. Smith*, 139 S. Ct. 2149, 2155 & n.2 (2019). And still others—such as the claim that the officers detained him because he is African American—might suggest that he intends to rely on the Equal Protection Clause. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

Admittedly, Dibrell's complaint did not need to expressly plead legal theories; it needed to plead factual allegations that impliedly established at least one viable theory. *Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam); *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 817 (6th Cir. 2020). Once the officers sought summary judgment, however, Dibrell was required "to come forward with every legal theory" on which he relied. *Nat'l Credit Union Admin. v. Mich. Nat'l Bank of Detroit*, 771 F.2d 154, 161 (6th Cir. 1985); *see* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1219, at 281 (3d ed. 2004). And Dibrell did not dispute the officers' view that his opaque complaint alleged only two "claims" under the Fourth Amendment—one for "false arrest" and "false imprisonment" and the other for "malicious prosecution." The district court accepted this reading. We do so as well and conclude that Dibrell has forfeited any other claims.

At the outset, though, we clarify that the Fourth Amendment does not adopt separate bans on "false arrests," "false imprisonments," and "malicious prosecutions." It establishes a singular ban on "unreasonable" "seizures." U.S. Const. amend. IV. And the Supreme Court has held that this uniform ban bars all *pretrial* detentions without probable cause to believe that a detainee has

committed a crime—whether or not the detention comes before or after formal "legal process" (like an arrest warrant or an indictment). *Manuel*, 137 S. Ct. at 917–20. False arrest, false imprisonment, and malicious prosecution are instead common-law torts. Restatement (Second) of Torts §§ 35, 41 (Am. L. Inst. 1965); Restatement (Second) of Torts § 653 (Am. L. Inst. 1977). The Supreme Court has sometimes relied on these torts, not to interpret the Fourth Amendment, but to establish the rules for § 1983 claims. *Manuel*, 137 S. Ct. at 920–22. And unlike the Fourth Amendment, these torts have traditionally distinguished between a detention before the issuance of "legal process" and a detention after it. At common law, the overlapping torts of false arrest and false imprisonment regulated a detention "*without legal process*." *Wallace*, 549 U.S. at 389. The tort of malicious prosecution, by contrast, applied to any detention after the "*wrongful institution* of legal process." *Id.* at 390.

Dibrell's false-arrest-and-imprisonment claim and his malicious-prosecution claim are thus specific versions of a general unreasonable-seizure claim alleging the same *constitutional* theory: that the officers seized (and continued to seize) Dibrell without probable cause (or even reasonable suspicion for the initial temporary stop). *Manuel*, 137 S. Ct. at 918; *compare Tlapanco v. Elges*, 969 F.3d 638, 654 n.3 (6th Cir. 2020), *with id.* at 658–60 (Thapar, J., concurring). Yet § 1983 sometimes adopts different *statutory* rules to govern the portion of a detention that preceded legal process (for which the torts of false arrest and false imprisonment might offer the best analogy) as compared to the portion that succeeded it (for which the tort of malicious prosecution might offer the best analogy). *Wallace*, 549 U.S. at 389–90. Here, for example, the officers raised a statute-of-limitations defense to Dibrell's false-arrest-and-imprisonment claim but only a merits defense to his malicious-prosecution claim. We address each defense in turn.

### 1. False Arrest and Imprisonment under the Fourth Amendment

The state appellate court found that the officers violated the Fourth Amendment when they initially detained Dibrell without reasonable suspicion. We need not consider the merits, however, because the district court correctly held that the statute of limitations barred Dibrell's claim asserting a false arrest and imprisonment for his initial detention and arrest.

The parties agree on two points about this statute-of-limitations question. They agree that § 1983 does not include a statute of limitations and that § 1988(a) directs us to borrow the statute of limitations from Tennessee for personal-injury torts. *See Wilson*, 471 U.S. at 278–79. They also agree that Tennessee has a one-year statute of limitations for those torts. Tenn. Code Ann. § 28-3-104(a)(1)(A). (Tennessee has another statute of limitations for actions "under the federal civil rights statutes." *Id.* § 28-3-104(a)(1)(B); *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015). Because this statute also sets a one-year period, we need not consider which statute would apply if the two limitations periods differed.)

The parties part ways only over the date on which Dibrell's claim "accrued" and started the one-year clock. Although the statute of limitations turns on state law, the question of when a § 1983 claim accrues to trigger the statute turns on federal law. *Wallace*, 549 U.S. at 388. The "standard" accrual "rule" for federal claims starts the limitations period "when the plaintiff has a complete and present cause of action" that can be raised in court. *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418 (2005)). The Supreme Court has contrasted this "standard" rule with a "discovery" rule that ties the start of the limitations period to when the plaintiff discovered (or should have discovered) the cause of action. *Id.* at 360–61. Any presumption favoring that discovery rule, the Court recently clarified, represents a "bad wine of recent vintage." *Id.* at 360 (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring in the judgment)).

In this § 1983 context, the Court has started its accrual analysis with the standard rule: that a claim accrues when the plaintiff has a complete cause of action. *McDonough*, 139 S. Ct. at 2155; *Wallace*, 549 U.S. at 388. Our § 1983 caselaw, by contrast, has started the accrual analysis with the competing discovery rule: that the claim accrues when the plaintiff knows of, or should have known of, that cause of action. *See King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017); *Johnson*, 777 F.3d at 843. Do our cases imbibing this "bad wine" warrant reconsideration in light of the Supreme Court's recent teachings? We need not resolve this tension now because Dibrell's claims would be untimely either way. If the standard rule were to apply here, the limitations period for a claim involving a false arrest and imprisonment would "commence to run" from the date of the wrongful arrest because the plaintiff has a complete cause of action at

that point. *Wallace*, 549 U.S. at 388, 390 n.3. And if the discovery rule were to apply, Dibrell's knowledge that he had been arrested (allegedly wrongfully) would start the clock on the same date. Either approach thus would have triggered the statute of limitations on February 17, 2014.

But the Court has not ended with the standard rule in this § 1983 context. Rather, it has proceeded to look to the accrual rules for the tort most like the constitutional claim at issue. *McDonough*, 139 S. Ct. at 2156. In *Wallace*, moreover, the Court made clear that the torts of false arrest and false imprisonment have special accrual rules. 549 U.S. at 388. These torts, which again challenge a detention without legal process, accrue at the earlier of two dates. *Id.* at 389–90. They accrue when the false *imprisonment* ends with the plaintiff's release. *See id.* at 389 (citing 2 H.G. Wood, *A Treatise on the Limitation of Actions at Law and in Equity* § 187d(4), at 878 (rev. 4th ed. 1916); 2 Arthur Underhill, *Principles of the Law of Torts* 202 (1881)). Or, if the plaintiff remains detained, they alternatively accrue when the *false* imprisonment ends with the issuance of legal process—when, for example, the plaintiff is brought before a magistrate. *Id.* at 389–90. "From that point on," a plaintiff relying on the law of torts to challenge any continuing detention must assert a malicious-prosecution claim. *Id.* at 390.

Dibrell's claim is untimely under these rules. His detention ended on February 18, 2014, when he was released on bond, so the limitations period likely started then. Underhill, *supra*, at 202; *see Fox v. DeSoto*, 489 F.3d 227, 233–35 (6th Cir. 2007). Dibrell makes no claim that the bond requirements imposed as a condition of his release qualified as a continuing "detention" for statute-of-limitations purposes, so we need not consider that theory. *Cf. Kingsland v. City of Miami*, 382 F.3d 1220, 1236 (11th Cir. 2004). And regardless, his bond hearing likely triggered *Wallace*'s alternative accrual rule tied to the issuance of legal process. *See Reed v. Edwards*, 487 F. App'x 904, 906 (5th Cir. 2012) (per curiam); *White v. Hiers*, 652 F. App'x 784, 786 (11th Cir. 2016) (per curiam); *cf. Bradley v. Sheriff's Dep't St. Landry Par.*, 958 F.3d 387, 391–92 (5th Cir. 2020). At the latest, this "legal process" issued when he was indicted in April 2015. *See King*, 852 F.3d at 579; *Lucas v. Holland*, 2017 WL 4764472, at *2 (6th Cir. Sept. 26, 2017) (order). Whether measured from the date of his bond hearing or the date of his indictment, the one-year statute of limitations had long run when Dibrell sued in September 2018.

Indeed, Dibrell's claim is identical to the claim that *Wallace* found untimely. The plaintiff in that case, Andre Wallace, had been convicted, and an appellate court had vacated his conviction. 549 U.S. at 386–87. He brought a § 1983 claim for an alleged false arrest and imprisonment under the Fourth Amendment. *Id.* at 390. The Court rejected his contention that this claim accrued on his release date. *Id.* Instead, the claim accrued "much earlier, when legal process was initiated against him[.]" *Id.* And we cannot accept for Dibrell what the Supreme Court rejected for Wallace.

Dibrell responds that his claim did not accrue until his ultimate release in April 2018. That is so, he asserts, because the "Defendants" falsely testified at a bond-revocation hearing that he illegally possessed a firearm, which caused him to be remanded to pretrial custody at an unidentified date. Yet this allegation raises a different Fourth Amendment "claim" attacking a second detention (this time, a *post-legal-process* detention) purportedly based on false testimony. And the Supreme Court noted in *Manuel* that it has yet to identify the proper accrual date for a claim challenging "post-legal-process pretrial detention." 137 S. Ct. at 921–22.

Like the Court in *Manuel*, we need not identify the proper accrual date for this separate claim. The claim fails because Dibrell's brief cites *no* evidence in support. It does not even tell us which officer gave the testimony about his firearms possession; it says only that the "Defendants" did so (on an unknown date and with no details). While allegations may suffice to withstand a motion to dismiss, they do nothing to withstand summary judgment. *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). In scattered parts of the record, we independently came across Dibrell's statements in an affidavit or an interrogatory response suggesting that Officer "Kimber" or "Kimble" gave this testimony. But "'[j]udges are not like pigs, hunting for truffles' that might be buried in the record," so our happenstance discovery of an iota of evidence does nothing to salvage his claim. *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (citation omitted). Not only that, a claim under § 1983 does not permit vicarious liability, so one officer's testimony provides no basis to hold the others liable. *Pineda*, 977 F.3d at 490. And even assuming Dibrell means Officer Fred Kimber (he did not sue an Officer Kimble), his "conclusory" statement without details does not suffice to create a genuine issue of material fact. *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).

In short, Dibrell's claim challenging his initial detention and arrest in February 2014 is untimely, and his claim challenging false testimony at a later hearing fails for a lack of evidence.

### 2. Malicious Prosecution under the Fourth Amendment

That leaves Dibrell's malicious-prosecution claim under the Fourth Amendment. The officers did not challenge this claim on statute-of-limitations grounds. *Cf. King*, 852 F.3d at 578–79. The district court instead held that it failed on the merits. To prove that a prosecution (or the detention accompanying it) was an "unreasonable" "seizure," a plaintiff must show, among other things, that the state lacked probable cause for the prosecution (or detention). *See Tlapanco*, 969 F.3d at 654. Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citation omitted). A grand jury's indictment also creates a presumption that probable cause existed, one that the plaintiff can overcome only by showing that the defendant fabricated evidence or recklessly made false statements outside the grand jury. *See King*, 852 F.3d at 586–88.

The state in this case established probable cause, and Dibrell has not rebutted the presumption of probable cause that arose from the grand jury's indictment. Dibrell was charged with twelve drug-trafficking counts of possession with intent to deliver or sell hydrocodone, oxycodone, and alprazolam within 1,000 feet of a school and child-care agency. Tenn. Code Ann. §§ 39-17-417, 39-17-432 (2014). Dibrell does not dispute that the state had probable cause to believe that the Walgreens at which the officers encountered him was within 1,000 feet of a school and a child-care agency. He also does not dispute that the state had probable cause to believe that the drugs he possessed were hydrocodone, oxycodone, and alprazolam. In fact, he stipulated to these facts at his trial.

Dibrell instead claims that the state lacked probable cause to find that he possessed the drugs with the intent to "deliver" or "sell" them. He is mistaken. The officers had received an anonymous tip that Dibrell was selling drugs. They then found the three types of drugs in bottles with nonmatching prescription-drug labels. *See Dibrell*, 2018 WL 1474226, at *2. (The officers identified the drug in each bottle using a pill-identifier website.) One of the labels also suggested

that the prescription had been issued to a different person; another suggested that the prescription had been issued years ago.  *Id.*  The officers next found more oxycodone pills in a bag on Dibrell's person along with about $800 in cash.  *Id.*  Given these facts, a "reasonable and prudent" person using common sense could believe that Dibrell had possessed the pills to sell them, not because he had a prescription for his personal use.  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citation omitted); *cf. Thorn v. McGary*, 684 F. App'x 430, 434 (5th Cir. 2017) (per curiam); *Roddy v. City of Huntsville*, 580 F. App'x 844, 850 (11th Cir. 2014) (per curiam); *DeFelice v. Ingrassia*, 66 F. App'x 240, 243–44 (2d Cir. 2003) (order).

To be sure, the state appellate court held that the Fourth Amendment's exclusionary rule required suppression of the drugs and money that created the probable cause for Dibrell's prosecution.  *Dibrell*, 2018 WL 1474226, at *14.  But Dibrell does not argue on appeal that the exclusionary rule should extend to this civil context.  *Cf. Black v. Wigington*, 811 F.3d 1259, 1267–68 (11th Cir. 2016).  Rather, Dibrell argues that the drugs that he possessed were lawfully prescribed to him for his personal use because of injuries he suffered in the military.  This defense does not overcome the probable cause that existed from all the facts, including the fact that the prescription drugs were in bottles with unmatching labels.  The jury, for example, rejected the defense when finding Dibrell guilty beyond a reasonable doubt.  *See Dibrell*, 2018 WL 1474226, at *4.  And probable cause does not require the same level of proof that the government needed to meet at Dibrell's trial.  *See Adams v. Williams*, 407 U.S. 143, 149 (1972).

Dibrell next points to his testimony from his criminal trial.  He impliedly suggested that the officers had lied about finding the drugs in bottles with nonmatching labels (or in a plastic bag).  *Dibrell*, 2018 WL 1474226, at *4.  But he presented no evidence to support this theory, as he was required to do at this stage.  *See Chappell*, 585 F.3d at 906.  His arguments thus fall short.

## B.  Claim Against the City of Knoxville

Section 1983 does not permit a plaintiff to hold a municipality like the City of Knoxville automatically liable for the unconstitutional actions of its employees under a vicarious-liability theory.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  But the statute does permit a municipality to be held liable if the plaintiff establishes that the municipality's "policy"

or "custom" is what led to a violation of the plaintiff's constitutional rights. *See id.* at 694–95; *Pineda*, 977 F.3d at 494–95. "Axiomatically," however, "[t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act" against the plaintiff. *Andrews v. Wayne County*, 957 F.3d 714, 725 (6th Cir. 2020) (quoting *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007)); *see also Griffith v. Franklin County*, 975 F.3d 554, 581–82 (6th Cir. 2020).

This axiomatic rule dooms Dibrell's *Monell* claim. As best we can tell, he does not rely on the Fourth Amendment to support it. Rather, he cites news articles (his only evidence) to suggest that the city had a custom of racial profiling. But Dibrell identifies no evidence that the officers targeted him because of his race. And he forfeited any equal-protection claim by failing to raise it in response to the officers' summary-judgment motion. Without evidence of an equal-protection violation in his case, he cannot establish that Knoxville's alleged custom harmed him. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

Dibrell argues that he could not develop evidence of the city's purported racial-profiling custom because the district court stayed discovery soon after the officers filed their summary-judgment motion. Yet he did not respond to the officers' motion to stay discovery, so the district court could hardly be said to have abused its discretion in granting it. *See Hahn v. Star Bank*, 190 F.3d 708, 719 (6th Cir. 1999). And, as the district court explained, it did not reject the *Monell* claim because of Dibrell's failure to establish a city custom (for which Dibrell allegedly needed discovery). It rejected the claim because of Dibrell's failure to establish a specific constitutional violation in his case. The search for evidence of the city's broader custom thus would have been "futile." *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1214 (10th Cir. 2006).

We affirm.